Philadelphia, Ed Al.   Is that what you're talking about? Oh, no, no. It doesn't matter. That's what my marching orders were. Good afternoon, Your Honor. May it please the Court, my name is Ted Hoppe, and I represent the plaintiff's appellants in this action, eleven evangelical Christians who regularly go out into the public streets and sidewalks and engage in traditional free speech activities. At this time, I'd like to reserve five minutes of my time for rebuttal. That's granted. Thank you, Your Honor. Your Honor, the primary issue in this case is the right of individuals to go out on the public streets and sidewalks and to engage in free speech activities without having that right restricted by the police because of the crowd's reaction to their message. Yeah. Let's start with the facts as you put them in your brief. You say that the plaintiff appellants came, among other things, with a bullhorn, with signs and with a bullhorn. Now, to what extent does free speech encompass the right to come with a bullhorn into an activity that is permitted and that has programs going on? Sure, Your Honor. Let's stick to the bullhorn and the allegation of disruption. Yes, Your Honor. The use of a bullhorn in engaging in free speech activities certainly is a protected act. Really? Sure, Your Honor. You mean you can come to a public, in a public forum and use a bullhorn so that other people who want to listen cannot hear because of the effect of the bullhorn? Your Honor, I think that's a different question. The first question is do you have the right to use a bullhorn when you're engaging in free speech activities? I think as a general rule, you absolutely do. Sure. You could go out on the street in front of my house in Center City and use a bullhorn. They do all the time. Sure. But suppose that bullhorn is interfering with the program and other people's hearing the program. Sure, Your Honor. What Supreme Court case do you cite to support that the use of a bullhorn or other speech harassment comes within the First Amendment? Your Honor, we have not taken the position that using the bullhorn in a manner to disrupt the ability of the event organizer to get out their message in this particular instance was allowed or even happened. If there was a situation where the bullhorn or the use of the bullhorn was interfering with the ability of the event organizer to get out their message, then certainly a reasonable time, place, and manner restriction would have been to instruct plaintiffs not to use the bullhorn. No, no. You gave us tapes, and the tapes certainly show that there was disruption. Your Honor, what the tapes, I believe, show is that the plaintiffs were using as part of their ability to get out their message, the use of a bullhorn, just like the pink angels who were seeking to stop plaintiffs from getting out their message were using whistles and chanting and other means on their own to overwhelm plaintiff's speech so people couldn't hear that. Two wrongs don't make a right. The question at the moment is directed to, they haven't sued. They haven't countersued. The question is whether what your clients were doing was disruptive. Your Honor. Yeah, go ahead, Mr. Hoppe. I'm sorry. No, go ahead. But I believe that there's nothing in the record to suggest that the use of the bullhorn was interfering with the organizer's ability to get out their message. And I would respectfully submit that the video does not show that. The one instance, Your Honors, if you recall from the video, after the plaintiffs got into the event, they first set up, with Captain Fisher's permission, at an area about 20 yards or so in front of the stage. And they did so with the assistance of the city police. In fact, the city police assured that your clients could enjoy their First Amendment rights by requiring the Philly Pride people, the gay pride organizers, or their security people, to step aside and permit the admission of your clients. Correct? Yes, Your Honor. And the city did what they're required by law to do, which is to allow people to go onto the public streets and sidewalks and engage in free speech activities. And I hear you say that, because I would like to know that at what point in time, in these unfolding events, your clients' constitutional rights were violated. Your Honor, our clients' constitutional rights were violated when Chief Tiano went to the plaintiffs while they were standing on a public street and sidewalk, engaging in traditional free speech activities, and instructed them to move to the edge of the event, of a 15 to 20 block area event, because the crowd was putting up 7th and Edge. Is that what he said? Yes, Your Honor. Is that what he said? Did he say, please move to the edge? Is there anything in the record to suggest that? Under threat of arrest, yes, Your Honor. Please move to the edge. Yes, Your Honor, to Woody's Bar on the outside perimeter of the event. I'm asking you about the words that were used, Mr. Hopi. Does Chief Tiano use them? In fact, Chief Tiano, in his deposition, described Woody's. Did he not? He described it as a gay bar, yes, Your Honor. It may have geographically been on one edge, but it was very much a part of the area of the city that had been set aside and permitted for this activity. It was, Your Honor, yes. It was a very small area of the 15 to 20 block event area on the public streets and sidewalks in the city of Philadelphia. What does the record show about why Chief Tiano asked, or Captain Tiano asked, that your clients move from that particular point? The record reflects that Chief Tiano asked them to move because the crowd was getting upset at the message that Mr. Marcavage and his group were conveying. Is that what he said? Yes, Your Honor. Let me follow up on that. I want to read you a little bit from a prior Third Circuit case, and I'm not quite sure, but I know how to pronounce it. It either is Gillies or Giles. I guess it's Gillies. I think it's Gillies, yes, Your Honor. We said there, of course we said, under the first step of the qualified immunity analysis, the issue is whether Davis's conduct, Davis was the fellow in your client's shoes in this case, violated Giles's First Amendment, I'm sorry, whether the police violated Giles's First Amendment rights. And we went on to say, of Gillies' questionable speech, some was derogatory language generically directed to the crowd. This type of language, when not personally directed at a particular member of the audience, is not likely to incite an immediate breach of the peace. Nonetheless, Giles's epithets directed at the woman who identified herself as a Christian and a lesbian, for in, quote, Christian lesbo, unquote, lesbo for Jesus, quote, unquote, do you lay down with dogs, quote, unquote, are you a bestiality lover, quote, unquote, were especially abusive and constituted fighting words. Where part of the speech constitutes fighting words, the police may arrest for disorderly conduct, even though other parts of the speech may be less provocative. Yes, sir. Now, I looked at this tape, and we had the estimates of, in any event, we had thousands of gay folks around, and plaintiff Diner, I guess that's how you pronounce it. Diner, yes, sir. Yeah, did exactly the same thing. The she-man, he addressed the she-man, and after the she-man responded, there was a more You won't be preaching like this in hell, she-man. Yes, sir. And we're in the context of a crowded situation and an excited crowd. How do you distinguish? Isn't Giles right on point? Do we have any authority to deviate from what this prior panel of this court said? Weren't these fighting words? Okay, she-man, and once you got a response, then you won't be preaching like this in hell, she-man. Your Honor, first of all, I think Giles is distinguishable because A, it occurred on a university campus as opposed to public streets and sidewalks. B, the court found that the language that was used went beyond that that was protected by the First Amendment to the point where I believe the facts in that case indicated that Mr. Giles was inciting people to riot. He was egging people on, and there was a lot more that was going on there. With Mr. Diener, we had a discussion going on between Mr. Diener and somebody that was in the crowd. Mr. Diener's part of that lasted for about a minute or so, as you see in the video. It was a small sideshow in the big picture of what was going on there, which was people engaging in free speech activities on the public streets and sidewalks. But even if Your Honor believes that Mr. Diener's speech was not protected, that alone does not eliminate the constitutional protections given to everybody else in all the other speech that they had and the rights that they had to be able to engage in free speech activities on the public streets and sidewalks. The police don't have the right to diffuse. If you've got fighting words, you've got 11 people who are all together, and they've got thousands of antagonists around them, and they pick a fight and they use fighting words. The police don't have the right to diffuse that situation by saying, okay, wait a minute, you just get off here for a while. Your Honor, I do see that my time is up. Is it okay if I go ahead and answer your question? Yes, please do. Your Honor, the police have the right to take steps, but the question is what are the appropriate steps that they have to take. The police have an obligation, and we have to remember big picture, that these public streets remain a public forum. The fact that there was a limited permit to control traffic and to allow an event to take place doesn't change that, and the trial podium acknowledged it remained a public forum. They were on the public streets with everybody else. What we have here is a situation where the police reacted to the crowd's response to the plaintiff's message. That is, by definition, a content-based restriction and is unlawful. You said the police could take an appropriate step. Why was it not an appropriate step? Taking into, again, your words, the big picture, which included the epithets and the language that has been recited here in the question and answer between Judge Staple and you, that the police simply asked the protesters to move on. And it was not until they refused that the arrest for disorderly conduct was effected. Your Honor, if I may, they didn't just ask him to move on, but for three reasons. First, what did, well, let's stop there. No, what did Chief Teano and other police officers ask that they do? Chief Teano instructed the plaintiffs under threat of arrest to move to an area of 13th Street adjacent to Woody's Bar. And was it only after, wasn't it only after their refusal that the arrest for disorderly conduct was made? Yes, because Chief Inspector Teano admits that up to that point they had done nothing wrong. But to answer the other question. Where does he say that in the record, Mr. Humphrey, that up to that point they'd done nothing wrong? If you bear with me just a moment, I'll give you the reference to that, Your Honor. It's JA2, Joint Appendix 2, 236 to 237. Your Honor, there's a couple reasons why what the police did was wrong. First of all, what the police did was not content neutral. And because it wasn't content neutral, it was unlawful. Second is because even if it were to be found to be content neutral, it was not narrowly tailored, and it was not. Why wasn't it narrowly tailored? Your Honor, the second reason is because it didn't leave up ample means of alternative communication. But the reason it wasn't. Wait a minute. Let's take that up. Carrying signs and giving out leaflets may not be disruptive, and that's an alternative means of communication. Why isn't that satisfactory under these circumstances? Given the time, place, and manner. If you're talking about within the event, Your Honor, they weren't given that option. Well, they were not told that they couldn't carry signs. Your Honor. Were they? Sure they were, Your Honor, because remember what happened. Wait, wait, wait. Where in the record does it say that the city officials directed the plaintiffs to put down their signs? And you're talking to somebody. There is none, Your Honor. Huh? There is none. Okay. And I didn't mean to suggest that. Well, that's what I thought you answered. No, Your Honor. I wasn't meaning to suggest that. Okay. So talking about the alternative means of communication, why isn't a silent carrying of signs and handing out leaflets an acceptable alternative means of communication? It may have been. But you said there was none. No, Your Honor. What I said was that the restriction they imposed did not leave open an ample alternative means of communication. That was only after they refused to move. But if all they had said, if the police had come in and said you can't carry a sign, a protest sign, saying whatever you want, you can't give out leaflets, we'd have a different situation here. Isn't that right? Yes. But he's suggesting that they were not given the right to carry signs and distribute leaflets where they wished to distribute them. Well, what I'm suggesting is that there are. Is that on the record? Let's go back to Judge Seva. Is there something on the record that showed that all the police asked them to do or that the police didn't ask them, that the police asked them to put down their signs? No, Your Honor. If I may, and just address the issue that you raised about the ample opportunities. I would like to get back to Judge Smith's point about the narrowing tailor because they do come together a little bit. It's the same thing. What I'm talking about with the ample alternate means of communication is what Chief Inspector Tiano said in his deposition. And what he was clear about, he was adamant about, was that he instructed the plaintiffs to go up 13th Street and locate themselves near Woody's Bar. And he expected them to follow his instructions without question. They were not given any other alternatives. What I'm suggesting to Your Honor is the reasonable time, place, and manner requirement requires the police to look to the least restrictive means necessary to accomplish what they're trying to accomplish. If what the police were concerned about, in fact, was the crowd's reaction to this message, there were other alternatives that they had that they could have employed. For example, they could have created a buffer zone between the two groups. They could have allowed Mr. Marcavage's group to move to another place in the event and stop the Pink Angels from following them to give the situation an opportunity to be diffused. Because your time is up, let me ask you a question that hasn't been raised yet. And that is, why do you think the heckler's veto is applicable here? Your Honor, I think this case involves the classic heckler's veto. It's a situation where the heckler's veto, as I know Your Honor is aware, is a situation where the government restricts speech of a speaker because of the crowd's reaction. Because of the content of the message. It translates into the content of the message. Absolutely, Your Honor. This case is the classic heckler's veto. You had plaintiffs engaging in protective speech on the public streets and sidewalks, and you had their right to do so restricted because the crowd was reacting negatively to that message. The defendants argue that all that was happening here is that the police were enforcing a reasonable time, place, and manner restriction. How do you answer that? Your Honor, that's the only thing that they can argue. Well, that's what they argue. Answer it. On its face, Your Honor, there's three reasons why that argument fails. First, the first test in the time, place, and manner analysis is that it be content-neutral. These restrictions were not content-neutral. There's two reasons that we know that. First, the police admit that the reason that they acted to restrict the plaintiffs' rights and to order them to go to this location up on 13th Street was because the crowd was reacting negatively to the message. Second, we had a situation where we had two groups on different sides of an issue who were debating that particular issue, the plaintiffs and the pink angels. And the police chose to restrict the plaintiffs' movements and order them to go to this location on 13th Street, but not the pink angels. And the reason they didn't restrict the pink angels was because the crowd agreed with what they were saying. Second, would you agree with me? Just closing, we've got to get on to others. But would you agree with me that the analysis you have just gone through would not be applicable at all assuming your clients were using, quote, fighting words as defined in our prior case and in the Supreme Court case law? Fighting words are not protected, right? Perhaps not, Your Honor, but let's just be clear. The only allegation of anybody using inappropriate words was Mr. Diener, not the other ten people. And the fact that even if you assume Mr. Diener said something inappropriate, the fact that he did doesn't mean that the other speech of the other ten people automatically became unconstitutional. Secondly, I don't think that the comments of Mr. Diener rises anywhere near the level of fighting words. Okay. Thank you. Thank you. We'll get you back. You saved a lot of time. Thank you, Your Honor. Now, let's see. We have a divided appellees. You're obviously not Jeremy, so you're Mrs. Svan, and you have nine minutes. Thank you, Judge Slaviter. I'm Dana Svan, and I represent the police officers, police council, and the city in this matter. I have some questions for you. Certainly. If I can start it off and if I can find them. At some point, well, why don't you start, and then I'll interrupt you when I find my questions. Okay. I did want to correct a couple things in the record, and then I do have a lot to say on the substantive legal issues. I'm sure. If you go to 59-SA in the record, it's a series of question and answer with Mr. Markavich trying to clarify the instruction that Chief Diano did give him, and I submit that it's clear on that record that the instruction was go to 13th and Walnut and not anything else, not put your signs down, not leave the event, not anything else. Do you agree this was 15 square blocks? I live in Center City, Philadelphia, so I can't find 15 blocks in that space, but everybody seems to agree with the district court's statement. Well, that was actually my second point, Judge Slaviter. I wanted to invite the court's attention to 2-SA of the record, which is a map of the event, and it demonstrates perhaps it was 15 to 20 square blocks entirely, but in terms of being asked to move out of the event, I think this was not 15 to 20, being asked to move to 13th and Walnut was not being asked to move 15 to 20 square blocks away from you. Where was the center of what was going on? What streets? As I said, I've lived in Center City forever, so forever as far as your ages go. I suppose you could consider the epicenter to be the stage, 12th and Locust, 13th and Locust, which is where, 12th or 13th, I'm sorry, and I used to live in that neighborhood as well. So that's about a block and a half away from Woody's Bar? Roughly, depending on whether you count the Little Streets or not, and that's where Mr. Markavich enters the event, and the group entered the event on the 10th. My questions to you are, the district court said on page 18, at some point, he said that the Philly Pride people could exclude others when they had a permit. Is that right? I mean, isn't that absolutely opposed to what we know about your free speech right? I mean, this is a public place. Just because they have a permit, do they have the right to exclude people who have different views? That obviously was not our view on this record, and it's not my view. But the district court did say that, right? Yes. The district court relied heavily on Hurley, did he not? Yes. And is Hurley really a correct analog to you? He took a more aggressive position, and I would invite the court's attention to the Worldwide Street Preachers case, where the court says, no, they're not attempting to be participants in this event, and to submerge the message in that sense. But there's a middle ground between participation and observer, and they clearly breached that ground here. They came here with a message to impart themselves. Well, they're entitled to do that, aren't they? What's odd about this case is that I was around 20 years ago when it was exactly the opposite. When the people who were proposing, took the position of the gay lesbian group, were the outsiders. And so you always have to, I always tell my law clerks, you have to look at these free speech cases from the position that you're not sympathetic to. Or from the position that you would be sympathetic to otherwise. So didn't they have the right to come in, show signs, give out leaflets with their position? Their position is protected under the First Amendment. And it was my client's position that it is, and for that reason we denied the request of the organizers to prevent them from coming in. But they are not permitted to disrupt activities that are ongoing. They are not permitted to congest and cause traffic flow problems. They're not permitted to come in and cause a safety problem. And whenever they do, we're allowed to place a restriction on them. And again, I'd emphasize place a restriction. The solution to this was not leave the event. The solution was move to a less congested area. Was it congestion or was it the fact that it, as plaintiffs say, the fact that it instigated opposition? Admittedly, part of the reason they were causing the congestion was that they were attracting opposition. Is that a legitimate reaction then to a First Amendment right to present one's position? In the context of a permit, absolutely, Your Honor. Why does the permit make a difference? The permit makes a difference because, and I use the analogy of separating demonstrators with opposing viewpoints, which police are absolutely entitled to do. In a permit context, when you're going to separate people with opposing viewpoints because they're heating one another up, they're causing congestion, they're disrupting an event, you're allowed to send them to their separate areas. In the context of a permit, we're not going to ask the people who are there to engage in the permitted speech to move. We're going to ask the counter, the people engaging in the counter speech to move. And again, I'd emphasize this. They were asked to move to an area where they would still be within sight and sound of their target audience. And I'd invite the court's attention to Ward v. Council Against Racism where the court said in terms of reducing volume with speaker controls that reducing someone's audience is not suppression. You're allowed to take action to reduce audience. And as we explained in our brief, the hecklers veto cases are completely inapposite here. Those cases apply in situations where we've suppressed your speech, where we've said we're using this as an excuse. We're lazy. We're just not going to allow you to speak at all because we don't want to be bothered. And in this case, I've submitted on this record, it was entirely clear that my officers took it upon themselves to make it a problem for us. We forced a blockade to be broken. We refused billing price requests. We let the demonstrators in. And we handled the problem. And this is how we handled it. And we are entitled to impose reasonable time, place, and manner restrictions in order to address giving order and structure to a message as opposed to suppressing that message. Let's go to the burden. The district court said it was plaintiff's burden to prove a violation of their free speech rights. Isn't that wrong? Haven't we said, I think I did, haven't we said that it's not the plaintiff's burden? I'm not aware of what case that would be, Judge. Well, it was the district court right to say the burden was on the objectors or isn't the burden on the city in a case like this? Once we're talking about reasonable time, place, and manner restrictions, yes, I believe it is our burden to satisfy the time, place, and manner test. And the district court said otherwise. Yes. So that was wrong. Yes, it was probably wrong, but I would submit that it doesn't make a difference. We have what's essentially an undisputed record here. We have a situation where we did take narrowly tailored measures. We let them in. We let them do what they want. When it became a problem, we asked them to move to a less congested area, and that's all that we did. And to draw on Judge Stapleton's point, we didn't ask them to move to the less congested area until what I would submit are obviously harassing remarks were made by Mr. Diener. And, again, we didn't arrest them for making the harassing remarks. I think that's clear on the record. We arrested them for refusing a legitimate instruction to move once those remarks were made. And I would submit that there's more than one remark. There's more than just that one remark. And I could go through the list, but I made a list off the tape. And there are a number of insulting remarks that were made to individual members of the crowd, which is analogous to the Gillis case. And I'd also point the court to another part of the Gillis case, which is the Gillis case talks about giving officers who are making on-the-spot decisions deference. And I'd invite the court, whenever you're reviewing the case law in this area, to remember that much of it addresses ordinances, injunctive relief situations where government has acted with the opportunity to deliberate. This is a situation where we are acting on the spot. We're balancing competing interests. We're balancing the competing free speech rights of two opposing groups. And we're entitled to that deference. If there weren't, however, fighting words on one side, how can you justify? Surely you have, if the police decide to create a buffer zone or something like that, they have an obligation to try to assure the opportunity of both sides to speak. Now, this apparently was not such a case. They said to one side, you go off in the corner over there and you stay over there. And they say we're not going to go and they say we're going to arrest you. But again, Judge Stapleton, this is in the context of permitted speech. And we're not telling him that he can't speak at all. We're telling them they can continue to engage in exactly the same kind of type of conduct they're engaging in, but they need to do it in a place that is less provocative. And again, I point to the district court's distinction that we're talking about the context of a permit, not the content of the speech. And that's what this is based on. And there are a number of cases that... The content of a permit. The context of the permit. The context of there being a permit, which again makes this like separating people with opposing viewpoints. And again... How does it do that? It's a non-exclusive permit. It's a public street. Everybody's welcome in this area at this time. I don't understand what you're talking about. Although it's clear on the record that a permit was engaged and that the purpose of this permit was to have a festival in which people were going to engage in this kind of speech. Sure, and they wanted the public to come. And these were part of the public that came. I don't understand what the permit has to do with that. And whenever there's a problem, you're entitled to separate them by saying the people who are engaging in the permitted speech can be in this area. And you can continue to engage in your speech, but you have to be in this area where, again, you're still within sight and sound. You're still able to evangelize. You're still able to do all the things that you were doing within the area of the permit. As long as you go over there. But we're going to have everybody else over here. Yes, but again, I think that the important distinction is, first of all, they were allowed to engage. We broke the blockade. We let them into the center of the event in the first place. And that, again, we didn't tell them you have to stop now. We told them you have to move over here. And that is completely different. I'd also invite the court's attention. Let's go back. I want to understand your position. Are you saying that when the police have to balance, which they obviously have to balance, that the fact that the Philly Pride people had a permit gives them an edge up in the balancing? Yes, Your Honor, and I'd submit that that's completely consistent with the court's position. Is there a Supreme Court case that says that? Well, just generally, the concept of it flowing from, I believe it's Chicago versus Park District, and the Crowell case in the D.C. Circuit as well, where the court has said this is in the nature of a permitting system. It's about giving order and structure to various messages. It's not about engaging in content discrimination of another message. And that's all this is, is giving order and structure to the message. It's not aimed at precluding messages. So the police told them to get in front of Woody's Bar. Is it your position that when they were in front of Woody's Bar, which I don't know where it is, but I mean I know where 13th and Locust is. If they're in front of Woody's Bar, could they use bull horns? There was no restriction given. They were just told to go to 13th and Walnut. They were not told that they had to restrict their speech in any other way. Absolutely. And I'd just like to add just one other point on this issue. It's the court's determination that we have to treat these two groups of people exactly equally and ignore the fact that this group has come into engaging counter speech and that it's content-based whenever we decide we need to move the 11 and then we'll solve the problem of the hundreds of people converging, causing traffic flow issues, causing safety issues. And so that if you tell us that we can't engage in that sort of activity and, again, still allow him to engage in the speech, that our action is presumptively invalid, it's content-based, that makes it an incredible problem to manage one of these situations. And, again, I just point to the fact that it's a difficult job. And I would submit that the tape demonstrates that my clients did that job admirably. It's a difficult job. Somebody has to do it. Thank you, Your Honor. And, again, I just remind you also not only does the Constitution give us leeway here, the Qualified Immunity Doctrine would give us even more leeway. I was going to ask you about that. Okay. Thank you. Thank you. Now there's another appellant's lawyer, Mr. Fry, representing Philly Pride. Yes, Your Honor. Jeremy Fry from Patter Hamilton for the defendants Philly Pride, Fran Price, and Charles Volz. And I'll go right at the issue that was, I think, being addressed by the court, and that is this case really only involves applying the rule of Hurley from the context of a permitted street parade to the context of a permitted street festival. Why is this Hurley? I don't understand. The Hurley was a parade, and they said that you don't have to let people who have a different message walk in your parade. I mean, basically. Correct. What does this have to do with Hurley? Well, there are a number of different levels in which it has, I think, everything to do with Hurley. First, Hurley held that it was a fundamental rule of protection under the First Amendment that a speaker has the autonomy to choose the nature of his message, and that when you impact that message, whether it's in a street festival, I think, or a street parade, you are still starting to impact and interfere with the autonomy of the speaker's message, and that is exactly what we assert occurred here. The concept that Hurley somehow doesn't apply beyond the context of a street parade, which, for example, has been sort of expressed in the Ninth Circuit case in Gathright, which came down, I think, during the course of the briefing in this case, we submit is just not the case. We think something much closer to the analysis, for example, that was conducted in the Third Circuit in the Diener case, which is unpublished, is much closer to the mark. I do have to tell you that we don't consider unpublished opinions, even of this circuit, as precedent. It's not precedential, it's certainly not binding, but it is, we believe, persuasive in terms of its reasoning and in terms of its holding. I didn't mean to interrupt your thought, but I have to tell you that. Yes, Your Honor. We know that. It's well known. You think the folks who were organizing and executing this festival were concerned that some people might think that what the plaintiffs here were saying was part of their message. Well, I think... You really think so? I think the concept of contrary as compared to, for example, competing or unwanted speech, I think is really ultimately more to the point, and I don't think Hurley, the ruling of Hurley ultimately speaks as easily to contrary speech or endorsement speech as compared to speech that is on its terms competing and unwanted, because it once again affects the... Competed and unwarranted. Where does the unwarranted come from? No, unwanted and competing. Wanted. Unwanted and competing. That is to say that it's being expressed in a way that is intruding or interfering on the First Amendment rights, in this case, of the permit holder. And we think the concept that there is a permit holder in this case is absolutely critical to the analysis. It's critical to the analysis in Hurley. It's critical to the analysis in... Could they have completely excluded people with a contrary position? Could they have stopped them from carrying signs? There are a number, I think, a number of questions in your honors. Well, yes or no first. They could not, I believe, exclude as a prior matter people from arriving at the festival and, for example, carrying signs of modest size, because I think, Judge, although this is not our case, that that kind of level of interference is not the kind of interference that really meaningfully intrudes on the ability of the permit holder to express its message. Well, they carried big signs. And they carried huge signs in this case. Well, so what? If they weren't talking, if they weren't harassing, if they carried signs and gave out literature, Christian literature, I guess that's what it was, I'll assume, to everybody who passed by, could the fact that your clients had a permit mean that they couldn't do that? I think the answer is more nuanced than a yes or a no. And the reason is, for example, if you bring into an event, and there's a main stage, as there was here at 13th and Locust, huge signs that would block the visibility of participants that represent competing unwanted speech by the event organizers, I think the answer is yes, because it's an interference with the permitted activity. Okay, that's disturbing that which people might want to see. Correct. But carrying, if they just walked, suppose they walked up and down the street and carried signs. Yes. But they say that people found offensive. So could they stop them? It is not our case. So as a matter of opinion. Yeah, but when we write an opinion, we have to think about the next case too. So could they stop them? The answer is it depends upon the specific facts, because it depends on an analysis of the interference, and that, we think, is the fundamental heart of what Hurley talks about, and of what Sistrunk and the other cases in this whole area talk about, is that it is about the measuring of interference. So you really have to look at the individual facts and decide whether or not that's interference. There are certainly other cases, Your Honor, that have already been decided in other circuits and by district courts as well, in which, for example, leafleting activity and the carrying of signs do not generally, if I may, constitute the kind of activity that interferes. In particular, it is not, for example, a bullhorn, which is what we had in this case, and that is typically, if I may, found to be an intrusion and disruptive and dilutive under the concepts of Hurley. Consider a military parade, and people against the Vietnam War, people against the Iraq War came in and carried big signs and put out leaflets. To what extent does the city of Philadelphia have an obligation to let them state their position and let their position be known? I think as long as the assertion of their position does not constitute unwanted competing speech. Unwanted by whom? Unwanted by the event organizers who hold the permit. Well, obviously it's going to be unwanted by the event's organizers. So at what point does it become the right of the protesters to the permitted position? It may or may not be unwanted. You have to know from a particular case. Assuming it's unwanted under our specific facts that the court is positing, then the question is whether or not it represents competing speech. That is to say, offered in a way that intrudes on the First Amendment expression by the permit holder of the message of that event. Okay, so that's different, it seems to me, than talking in terms of competing speech. Talking in terms of disruption or interruption is a different kind of issue than competing. And you keep talking about competing speech, and that worries me. Well, the reason I talk about competing speech, Your Honor, just to make this point very clear, is it is all necessarily about the interference with the First Amendment message of the permit holder, and I make that plain. But I use the word competing because, for example, I could imagine the exercise of First Amendment kinds of speech activities by persons whose speech is unwanted, and yet they do it in a way that is not competing with the event. For example, you could find, I'm not suggesting that you necessarily would, that leafleting is not really competing, would not have really been a competing activity with respect to the 2004 Outfest event. You could find, and it's not our case, that wearing of a t-shirt would not be competing speech, and yet it would be speech. And it would also be perhaps unwanted, although you would have to determine that from the standpoint of the event holder. It is only when the speech is publicly expressed in a way, by volume, by location, there may be all variety of factors that may play, in which you find the speech competing with the message, interfering by that competition. Interfering, yeah, but what I keep pointing out is, to me at least, I don't know about my panel, interfering is different than competing. This country was founded on competing speech, but not necessarily on interfering. They probably did, but we don't know about that. I don't mean to get, and I know nomenclature is very important. Yes, it is. I am agreeing with the concept, and I am, in fact, not only agreeing, I wholeheartedly support the idea that the fundamental analysis, as we indicated in our brief, regardless of whether the formulation is competing or not, the fundamental concept is that conflict of First Amendment speech, in which the issue is the rights of the permit holder to exclude and prevent the, if I may, the interference with the expression of its message. That's different. Yes. Do you have any questions, Judge Sinclair? No. Judge Smith? Thank you. Okay, Mr. Hoppe? Thank you, Your Honor. You have five minutes, Linda? Yes, Your Honor. Your Honor, I want to make sure that we don't get lost in this whole discussion, the big picture here. This is a situation where an event with a non-exclusive permit was held on the public streets and sidewalks, and people were engaging in free speech activities. One thing, while there may be a lot of nuances under First Amendment law, for the past 60 years, the law has been clear that the police do not have the right to restrict speech on the public streets and sidewalks because the crowd is getting upset by that speech. Do you disagree with the formulation subsequently made, which is that the police have the right to stop counter views from interfering with the views by the permit holders? Just put it in those terms. Interfering. We're not talking about the other word. Just interfering. As a general rule, yes. You disagree? Oh, I'm sorry. No, as a general rule, I would agree that the Philly Pride organizers had the right to engage in free speech as well. And that your clients couldn't interfere with, and this is a question, that the city had the right to be sure that your clients didn't interfere with the message of the permit holders, the Philly Pride people. You may disagree as to what is interference, but let's get the broad statement out. If there was a concern about interference, yes, the police could take steps to ensure that it wasn't interfering. For example, when at the beginning of the video you saw that when the speaker got up on the stage or was getting ready to get up on the stage, Captain Fisher went to the plaintiffs and said, you guys got to move because they're getting ready to speak on the stage and it's going to interfere with them being able to hear. Now, he added some drama by threatening with arrest when he made the request, but nevertheless, they agreed and they moved. That was something that was within the purview of the police to be able to do. But what the police did not have the right to do was to restrict the plaintiff's speech and to tell them where they could go and to limit them to one small area of a 15 to 20 block event and to limit their access to people. There is no rule under constitutional First Amendment jurisprudence that says that sight and sound is an exception to the First Amendment. The city wants to rely on the sight and sound, but there is no such rule, Your Honor. But sound can be an interference, can it not? Yes, Your Honor, exactly. And as I indicated before, I think Your Honor started off my questioning at the beginning with the issue about the bullhorn. And I'd suggest to you, Your Honor, that that was one of the things I was going to suggest as a reasonable alternative that could have been imposed. If we had a situation where the noise level was causing the disruption, the police certainly could have gone to the plaintiffs and said no bullhorns as well as the Pink Angels and said no whistles because as you know from the video, you can hardly hear the plaintiffs speaking over the whistles and chants and all the other stuff going on by the Pink Angels. If everything else, putting it aside, why didn't the defendants have qualified immunity for that which the police and the city did? Your Honor, we did brief it pretty extensively in our brief. Yeah, but I'm asking you now. I'll say this, Your Honor. For 60 years, ever since Terminello came out in 1949, it's been absolutely crystal clear that the police do not have the right to go to a speaker on the public streets and sidewalks and to tell that speaker that you can't engage in free speech activities because the crowd's getting upset at your message. Second, for longer than Terminello's been around, it's been time out of mind, the Supreme Court has said. The public streets and sidewalks have been the quintessential public forum where people get to go out and engage in free speech activities. And as Your Honor, Judge Sloboda noted in one of the other questioning, that speech is founded upon the right of being able to go out and engage in provocative speech. If the First Amendment does not protect provocative speech, if it doesn't protect the right of plaintiffs to go out on the public streets and sidewalks and say things that get people upset, then it doesn't mean anything. We don't need a First Amendment that protects speech that everybody agrees with. We need a First Amendment that protects speech that's controversial or provocative. Your Honors, I think you have to remember, too, that the Philly Pride organizers here chose to hold this event on the public streets and sidewalks and to open it up to everybody to come without restriction. You didn't have to have a ticket or an invitation to get into this event. Everybody was welcome to come to this event. And when they do that, they must accept everything that comes along with that, which is the idea that people are going to come into their event with contrary views and have the right to express those views. We'll see when my time is up. Thank you very much. It's an interesting case. We'll take it under advisement.